**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW HAMPSHIRE**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| | ) | |
| v. | ) | Cr. No. 10-CR-00085-SM |
| | ) | |
| | ) | |
| BEATRICE MUNYENYEZI, | ) | |
| Defendant | ) | |

**GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION FOR BAIL REVIEW**
**PURSUANT TO 18 U.S.C. §3142(f)(2)(B)**

The United States of America, by and through Gretchen Leah
Witt, Attorney for the United States, Acting Under Authority
Conferred by 28 U.S.C. §515, and Special Assistant United States
Attorneys Aloke S. Chakravarty and Jeffrey Auerhahn, for the
District of New Hampshire, files this opposition to Defendant's
motion seeking release from pre-trial detention.  As found by
Magistrate Judge Daniel J. Lynch, there are no conditions or
combination of conditions that will reasonably assure the
appearance of the Defendant or the safety of the community.

The Defendant is charged in a two count indictment with
procurement of citizenship unlawfully.  The indictment describes
the Defendant's personal participation in the genocide in Rwanda
in 1994, through, inter alia, incitement and advocacy of the
persecution and murder of Tutsis, the use of rape as a weapon of
the genocide, as well as personal participation in murder,
including the murder of a child.  In addition, the indictment
enumerated repeated instances of lying to officials of the United

States government for the purpose of receiving immigration
benefits, including, ultimately, citizenship.

**Basis for Detention**

Pursuant to 18 U.S.C. §3142(f), in determining whether any
conditions will secure the appearance of the Defendant and the
safety of the community, the Magistrate Judge considered whether
the Defendant, who has repeatedly lied to obtain benefits, can be
relied upon to comply with restrictions placed on her actions,
and conform her behavior to the Orders of this Court.  That
detention determination can be revisited when there is new
information which has a material bearing on the detention
decision which was unknown to the Defendant at the time of
initial determination.  18 U.S.C. §3142(f).

The proffered evidence against the Defendant is compelling.
Several eye witnesses have identified the Defendant's personal
actions in furtherance of the genocide, including acts of
violence, crimes of moral turpitude and dishonesty.  The self
evident risks to society by the release of a defendant accused of
these acts were assessed by the Magistrate Judge.  The
Defendant's role in these acts is supported by several witnesses,
including victims, perpetrators and others.  Most of the
individual witness have no relationship to each other and neither
did they have any opportunity to "compare notes" or otherwise
concoct a similar story.  In addition, none appear to have any

2

personal motive to falsely accuse the Defendant.

At paragraph 10 of the Affidavit of Special Agent Andersen in support of the warrant to search Defendant's residence, the Special Agent stated as follows:

> The following information about MUNYENYEZI was developed from review of documentary evidence as well as several witness interviews in Rwanda.  With regard to my statements regarding MUNYENYEZI's activities during the Rwandan genocide, this is the result of interviews I conducted of different individuals who each were personally present during the time that MUNYENYEZI engaged in this conduct.  For purposes of this affidavit, I will refer to only some of these witnesses and will refer to them as Witnesses W1-W7[1]. I believe these witnesses are reliable because they are eyewitnesses for whom it is a great personal risk to submit to being a witness and because there is no motivation to provide false information, given that many of these witnesses currently reside in Rwanda and have no contact with MUNYENYEZI.  In addition, before conducting the interviews of these witnesses, I did not announce the purpose of my questioning or the anticipated utility of statements being provided.  In addition, most of these witnesses had no opportunity for contact with each other; therefore, the information each provided was based on his or her own experiences during the Rwandan genocide.  Moreover, I have corroborated substantive information from each of these witnesses either through interview of other individuals, statements made before other tribunals, or from observations of documents and through other investigative steps.

The potential penalty the Defendant faces creates a compelling incentive to flee.  Should the Defendant be convicted,

---

[1]The seven witnesses discussed in the Affidavit are not all the witnesses who have identified the role of the Defendant.  There are additional individuals who are potential trial witnesses who are identified in the materials being produced to defense counsel in discovery.

she faces up to 10 years imprisonment on each count.[2]  In
addition to the possibility of substantial incarceration in the
United States, the Defendant would also be stripped of her
citizenship if she were convicted, and would then likely be
placed in immigration proceedings.  Although there is no
guarantee that she will be returned to Rwanda to face prosecution
for her role in the genocide, she should be concerned of that
possibility; she faces the possibility of a life sentence in
Rwanda, if that is where she is to be deported after proceedings
in the Immigration Court.

     In addition to the summary of the evidence of guilt, the
government presented additional evidence that the Defendant is
part of a support network in the diaspora that includes other
genocidaires.[3]  Consequently, the Defendant would be left with

_____

[2]There is precedent in similar cases for a maximum sentence or a
sentence near the maximum.  For example, last month, a former
Guatemalan soldier was sentenced to 10 years' imprisonment for a
conviction for the same offense charged against Munyenyezi.

[3]It is typical for the perpetrators of atrocities to attempt to
dispute and discredit the testimonies of survivors and, in this
case, to re-characterize the targeted extermination of Tutsis in
Rwanda as a civil war.  There is no question that the roadblocks
in Butare and elsewhere in Rwanda between April and early July
1994 targeted Tutsis.  There is also no rational dispute that
there was a genocide in Rwanda during that time period and
hundreds of thousands of Tutsis were murdered by the Defendant
and those with similar beliefs.  Although we are still awaiting
the verdict in the Defendant's husband's case, there have been
convictions and guilty pleas at the ICTR and other courts.  (For
example, the Defendant's friend and co-conspirator Desire
Munyaneza was convicted earlier this year in Canada for his role
in the genocide in Butare.)  It is a matter of judicial notice to

4

opportunity, incentive and capacity to flee, intimidate witnesses, or to re-offend.

The Defendant now raises two issues before the court which she claims are newly discovered information which were unavailable at the time of the initial detention hearing, and that they have a material bearing on the issue of whether the Defendant should be released.  The government disagrees, and the issues which the Defendant now raises neither makes the Defendant less of a danger or less likely to flee, nor does it undermine the basis for detention relied upon by Magistrate Judge Lynch. Moreover, the defendant has offered no new reasons to believe that she is more likely to conform her behavior to any conditions of release were they to be set by the court, and she has offered no conditions that might be accepted by the Court as adequate.

**1.    Defendant attacks the credibility of government witnesses because the Rwandan government must have influenced their testimony**

The Defendant's primary basis for bail review is the averred revelation that the present Rwandan government regime is totalitarian and biased against the Defendant.  This premise becomes the foundation for the concomitant argument that because of the present Rwandan regime's animosity, they must have unfairly and surreptitiously influenced the testimony of over a

---

acknowledge the occurrence of the Rwandan genocide.  The characterization of the killing, however, has no bearing on the detention determination.

dozen Rwandan civilians.[4]  As further evidence of this, the
Defendant avers that a U.S. investigation could not have occurred
in Rwanda without manipulation by the Rwandan government, as
further evidenced by the fact that lawyer working for the United
Nations never learned of the Defendant's crimes until this
prosecution.  The Defendant's argument is fueled by assertions of
Rwandan intolerance for dissent, highlighted by high-profile
excesses of Rwandan law which allow prosecutions for denial of
the existence of genocide.[5]  Regardless of these allegations,
which resonate in a society where divergent beliefs are
protected, they are red herrings to the legal issues before the
court.  Stated bluntly, none of this "newly discovered
information" supports an argument that the testimony in this
case, let alone any other case, has been concocted or manipulated
by anyone.  Moreover, criticism of the current Rwandan government
for quashing dissent is not newly discovered information, indeed,
it is the *raison d'etre* of organizations and networks run by the

---

[4]While there is no evidence whatsoever to support the allegation
that the Rwandan government (or anyone else) did anything to
suggest to government witnesses what they should say, as is
discussed below, there is direct evidence that the Defendant
assisted in such a scheme involving testimony at her husband's
trial at the ICTR.

[5]Although this might offend our notions of free speech, Rwanda is
actually not so unique in this attitude towards those who would
deny the historical fact of a genocide; in Germany and other EU
countries, Holocaust denial is a crime, largely in order to deter
the potential cultivation of the sentiments which could lead to
repetition of these horrific events.

Defendant's family and friends.  This prosecution was investigated and is being prosecuted by the United States; it is not being brought by or on behalf of any other sovereign.

The Defendant's re-characterization of the genocide in Rwanda as a "fratricide" is consistent with the actions of the exiled members of the Hutu elite/genocidaires who continue their desire and efforts against the current Rwandan regime.  Items seized during the search of Defendant's home establish that the Defendant routinely characterizes the genocide as a "war," which started in 1990, that she is friendly with other convicted genocidaires, and describes America as bolstering the Rwandan regime.  The Defendant avoids description of any violence that occurred during the genocide when discussing that time period in her memoirs, and even one of her young children wrote a book about why she considers America to be her "enemy" because it has imprisoned her father.[6]  In considering the history and characteristics of the Defendant and whether she is an appropriate candidate for release, the Court can consider the lessons she teaches her children about how they should view the United States – the country that gave them refuge (and has provided to them financial support and opportunities).

---

[6]In fact, the child's father has been held in the custody of the United Nations' International Criminal Tribunal for Rwanda, suggesting that the Defendant has taught her children that the ICTR is a proxy for America.

This latter fact – that she views the United States as the
enemy – is not an Orwellian barometer of nationalistic loyalty,
rather, it is highly probative on the issue of whether the
Defendant is likely to flee, rather than take the chance of a
long sentence and being stripped of her citizenship.  She has no
real strong feelings of allegiance to the United States.  She has
taught her children that the United States is their enemy.
Therefore, there are no compelling reasons for her to remain
here.[7]  If released on any conditions, she will likely leave the
country that is her enemy and take refuge among the diaspora
comprising of other genocidaires.

The Defendant attempts to attack the statement of Special
Agent Andersen (and the witnesses) through the affidavit of
Attorney Normand Marquis, who represents the Defendant's husband
before the ICTR.  Attorney Marquis claims that

> I am personally aware of the procedure by which the
> U.S. Government agents *must have* collected information
> while in Rwanda.  M. Andersen would not have been
> permitted by the Rwandan government to roam about and
> interview witnesses.  He would have needed Rwandan
> government oversight and permission.

(emphasis added).  Attorney Marquis further states:

> From evidence tendered before the ICTR and from my
> personal experience and knowledge, it is self evident
> that no one can go in Rwanda to conduct investigations
> without the government being made aware and authorize

---

[7]In addition, there are no tangibles holding her here; she
currently lives in a house she rents, and the home she previously
owned was foreclosed.

these investigations, the reasons for the
investigations and the subject of those.  Even photos
of site crimes cannot be taken without previously being
authorized and anyone who acts otherwise faces
immediate imprisonment.

First, Attorney Marquis does not explain his basis of knowledge

for being "personally aware" of U.S. government procedures and

the restrictions, if any, placed by the Rwandan government on the

investigative activities of the U.S. government.  In addition, he

states that the agents "*must have*" followed certain procedures.

He does not and cannot claim that he has any knowledge that they

in fact did; even if he had some general knowledge of

restrictions placed by Rwandan authorities on other

investigators, he has no personal knowledge of what Special Agent

Andersen did in *this* investigation, which was not unduly

restricted or influenced by the Rwandan government.

Restrictions Attorney Marquis might have faced have nothing to do

with the relationship between two sovereign governments.  The

requirements of that relationship would necessitate U.S.

government receiving permission for criminal investigators to

operate in Rwanda, but that does not mean that the Rwandan

government would exercise any "oversight" over such

investigation[8], or that any Rwandan government official would

_____

[8]The only advance notice would be in connection with some
prisoner witnesses; a member of the Rwandan prosecutor's office
would provide the U.S. investigators with information concerning
where a particular prisoner was located and a letter of
introduction to the particular prison.  On occasion, additional

participate in interviews conducted by the U.S. investigators.
It is quite a stretch to suggest that Rwandan government notice
and authorization to U.S. officials to conduct investigations,
puts the Rwandan government in a position to script the testimony
of witnesses.  The suggestion is totally unsupported in reason or
in fact; even if the Rwandan government had wanted to manipulate
the witnesses' statements, they were not given the opportunity to
do so and there is no evidence that they did.

Despite Mr. Marquis' opinion that it would be impossible
without being arrested, agents and attorneys did in fact "wander"
around Rwanda without an escort of a Rwandan government official
and took photographs at a number of different locations, without
forewarning to Rwandan officials and without objection or
harassment.  Many of these photographs were provided to the
Defendant in automatic discovery.  The only time there was any
Rwandan government official present when pictures were taken was
when certain sites were identified by a prisoner who was in

---

prisoner witnesses were interviewed without any advance notice
whatsoever when another potential witness in the same prison was
identified.  No advance notice was necessary with reference to
witnesses who were not in custody.  The only participation any
member of the Rwandan prosecutor's office had in connection with
non-prisoner witnesses, was to assist in finding a limited number
of all the witnesses interviewed on the day they were
interviewed; there is no phone book to consult, outside of the
capital it is rare to see a street sign, and many roads are
unnamed.  In connection with the majority of the witnesses, even
this limited assistance was not utilized.

custody and an armed guard escorted the prisoner.[9]

Further, Attorney Marquis states that

[i]t is striking that even the same words or
expressions that were opposed to my client are now
attributed to his wife by the witnesses that were
presented to M. Andersen for interviewing.

First, as stated above, the witnesses were not "presented" to
Special Agent Andersen.  Second, the Defendant and her husband
were actively advocating the genocidal actions of targeting the
Tutsis in Butare during the period (approximately) late April to
the end of June 1994.  They were co-conspirators and co-venturers
in a number of specific criminal acts.  Thus, it is not
surprising that there would be similarity in the accusations.  In
fact, the opposite would be true.

In addition, due to the tens and hundreds of thousands of
genocide perpetrators, and limited resources of the ICTR and the
Rwandan government, it has not been possible to thoroughly
investigate every genocidal act that occurred.  It was not the
mandate of the ICTR to identify and prosecute all participants in
the genocide; their defendants are only a limited number of those
most culpable who were in leadership positions.  With reference
to charges in the courts of Rwanda, there was little incentive or

---

[9]When prisoners were just interviewed and not taken out in the
public by U.S. officials, the interviews would take place either
in a room at the prison or in a room at the prosecutor's office
that was provided for the exclusive use of the U.S.
investigators.  In both instances, no Rwandan government
officials (including prison guards) were present.

ability to commence investigations into perpetrators who had fled from Rwanda prior to the commencement of the gacaca system or widespread judicial proceedings.  It is, therefore, hardly surprising that Mr. Marquis did not seek nor passively learn of inculpatory evidence related to the Defendant, and it is questionable if he would be inclined or permitted to do so given his obligations to his client.

2.   **Defendant claims that since a defendant in another case was released on similar charges, that this Defendant ought to be released**

The Defendant points to the case of Lazare Kobagaya as an example of a similarly situated defendant who was released. However, there are more significant differences than there are similarities between Kobagaya and this Defendant.  Kobagaya is 82 years old and in poor health.  Although he had traveled overseas in 2005 and 2008, that was before Kobagaya had knee replacement surgery.  See Order of Release of Magistrate Judge Bostwick in the Kobagaya case dated April 29, 2009.  In addition, in Kobagaya, both the government and pre-trial Services agreed to Kobagaya's release.

In this case, the Defendant is younger, is more able to and has traveled more extensively.  She has significant contacts with individuals overseas and with other genocidaires.  Although she lives in New Hampshire with her family, her roots are not deep. In this case, unlike in Kobagaya, both the government and Pre-

Trial Services agree that detention is necessary.

In addition to different relative positions, the Defendant's crimes are also different from Kobagaya's.  The types of activities which the Defendant engaged in during the genocide were more diverse, covered a longer period of time, and there are more anticipated witnesses supporting them.

The fact that the ICTR did not select the Defendant as one of the few individuals who they could prosecute as they tried to limit defendants, or that another sovereign did not conduct an investigation of a defendant who resided in the United States does nothing to undermine the strength of the case, or the tragic and horrific acts which the Defendant is alleged to have committed.

**Perjury and Subornation of Perjury by Munyenyezi**

The Defendant attached to her motion excerpts of her testimony before the ICTR during the trial of her husband Arsene Shalom Ntahobali.  First, in connection with her testimony on February 27, 2006, the excerpt provided begins at page 47 with the cross-examination.  The first 30 pages of the transcript of that day consists of the examination by attorney Marquis, whose affidavit is included in the Defendant's filings in this case.  A complete transcript of Defendant's testimony on that date is attached hereto and marked Exhibit A.

As discussed more fully in a short sealed supplemental

13

memorandum that is being filed this date, the transcript of her
testimony demonstrates that the Defendant is willing to lie[10]
(not only to U.S. officials for her own benefit, but also) under
oath to an international tribunal during a genocide trial in
order to try and help her husband.  This is relevant to whether
the Court can release the Defendant on the promise that she
follow the orders of this Court.

     Furthermore, the Defendant received instructions from her
husband concerning what witnesses should say during their
testimony.  Attached hereto and marked Exhibit B is a translation
of a letter from Ntahobali to the Defendant, that was seized
during the search of her home.  In the letter, Ntahobali gave the
Defendant instructions concerning what she (the Defendant) should
tell a witness to state during testimony.  The Defendant did not
just commit perjury herself, she also assisted her husband in
communicating with, for example, her sister Prudence Kantengwa,
who was also a defense witness.  Attached hereto and marked
Exhibit C is a letter from Ntahobali to Kantengwa that included
excerpts and citations to the testimony of other witnesses
(including the Defendant) and suggestions as to what Kantengwa
should say during her testimony.[11]

---

[10]The Defendant also lied about facts that will be at issue in her
trial.

[11]Ntahobali told his sister-in-law (currently a defendant in a
pending federal case in the District of Massachusetts) "you have

**Conclusion**

For the reasons stated in the Magistrate Judge's Order of Detention, and for the reasons set forth above and in the Affidavit of Special Agent Andersen in support of the warrant to search the Defendant's home, there are no conditions or combination of conditions that will reasonably assure the appearance of the Defendant or the safety of the community; therefore the Defendant should continue to be detained.

<div style="margin-left: 40%;">

Respectfully submitted,

Gretchen Leah Witt,
Attorney for the United States,

Acting Under Authority
Conferred by 28 U.S.C. §515

</div>

By:    /s/ Jeffrey Auerhahn
       Jeffrey Auerhahn and
       Aloke S. Chakravarty
       Special Assistant U.S. Attorneys

<div align="center">

Certificate of Service

</div>

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).


        /s/ Jeffrey Auerhahn
       Jeffrey Auerhahn
       Special Assistant U.S. Attorney


Date:     October 1, 2010

---

never seen this document" and "[t]he witnesses are not supposed to see this."